Bruce A. CLARK, et al., Respondents,

v.

Pansy P. CLARK and John R. Clark, Appellants,

Raymond Reister, trustee, Defendant.

Nos. 48479, 48480.

Supreme Court of Minnesota.

Aug. 17, 1979.

Maslon, Kaplan, Edelman, Borman, Brand & McNulty and Marcy S. Wallace, Minneapolis, for appellants.

Henson & Efron and Alan C. Eidsness, Minneapolis, for respondents.

Heard before TODD, YETKA, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

These consolidated appeals, taken by defendants Pansy and John Clark, involve a judgment entered by the Hennepin County District Court which, *inter alia,* imposed a constructive trust on most of Pansy Clark's property; permitted her to use the trust property for her "needs" during her lifetime, with the balance of the property being preserved for the benefit of plaintiffs and their sister; required her to execute an irrevocable inter vivos trust and pour-over will to implement the constructive trust; and required John Clark to give to the trust his promissory note in the amount of approximately $23,000 for a transfer Pansy Clark had previously made to him. We affirm in part and modify in part.

Pansy Clark[1] (hereafter "Mrs. Clark") and her late husband Thomas R. Clark ("Mr. Clark") had six children—John, Philip, Bruce, Ross, Winifred, and Thomas. They also raised a niece, Edith Imm, to adulthood. Bruce, Philip, and Ross are plaintiffs in this action. Winifred originally joined as a plaintiff, but withdrew prior to trial. Thomas died in 1972.

Mr. and Mrs. Clark acquired certain farm property in Eden Prairie, Minnesota (hereafter "Hennepin County farm") in 1946. Also in that year, John returned home from the service and became actively involved in the operation of the Hennepin County farm on a part-time basis while he attended college. In early 1951 John quit college prior to graduation and helped his parents fulltime on the farm. At that time, Mr. Clark's health was failing.

In the fall of 1951, John and Mr. Clark purchased farming property in Shakopee, Minnesota (hereafter "Scott County farm"), on a contract for deed. They were equal partners in this venture, with Mr. Clark contributing additional capital to reimburse John for his uncompensated work on the Hennepin County farm. Before Mr. Clark could raise his share of the down payment, the Hennepin County farm encountered great financial difficulties. John was able to make certain financial arrangements with the creditor to save the Hennepin County farm and raise additional monies for the down payment on the Scott County farm.[2] Due to Mr. Clark's failing health, however, the creditor agreed to these arrangements only on the condition that John would assist his father in the operation of the Hennepin County property as manager of the farming operations.

John lived on the Hennepin County farm until his marriage in February 1957, and continued to run the farm and feedlot until Mr. Clark died in August 1957. During

---

1. Mrs. Clark was 82 years old at the time of trial.

2. It should be noted that the Scott County farm was enlarged in 1955 when Mr. and Mrs. Clark and John acquired adjacent property on a contract for deed. At that time the entire Scott County farm was apparently refinanced, with a mortgage indebtedness created.

that period, none of the other children helped in the farming operation except for Philip, who worked for wages for 18 months in 1952 and 1953, and Bruce, who also worked for wages for ten and one-half months in 1956 and 1957.

When Mr. Clark died in August 1957, he had not executed a will. At the time of his death, Mr. Clark alone held legal title to the Hennepin County farm.[3] The property was then valued at about $20,000. Mr. Clark also owned certain personal property, including various pieces of farm equipment. The Scott County farm was held in joint tenancy by Mr. and Mrs. Clark and John. Since the estate was heavily encumbered, it was apparent that if the estate were liquidated there would be little to distribute to the heirs. Accordingly, the family entered into a written settlement agreement whereby plaintiffs, Winifred, and Tom would convey their interest in their father's personal property to Mrs. Clark and their brother John. The purpose of the agreement was to allow John and Mrs. Clark to continue the farming operations so that the estate's indebtedness could be paid off and the assets could be preserved. Under the terms of the agreement, the Hennepin County farm was to descend according to the laws of intestate succession. In addition, the agreement provided that Mrs. Clark would make a will leaving all of her estate at the time of her death to her six children, in equal portions, except for a specific bequest to her niece, Edith Imm.

Bruce testified that around the time the settlement was entered into, John and Wallace Odell, the family attorney, told him that in order to have the farming business continue and to avoid inheritance taxes, it was necessary that the children quitclaim the Hennepin County property to Mrs. Clark. He claimed that he executed such a quitclaim deed in 1958 and understood that his other brothers and sister had done the same. Bruce stated that he had a conversation with his mother in 1958 in which she

had promised that in return for the children's giving up their inheritance rights she "would preserve and keep that property" for the children's use. He also claimed that his mother told him " * * * that she would divide all of her property between her children with the exception of John, who was her partner, and that she reserved the right to leave an inheritance of five thousand dollars for Edith Imm, my cousin."

Philip indicated that he did not remember the specific conversations with his family, but stated that he recalled discussions with his mother to the effect that " * * * the best thing for us to do was sign quitclaim deeds which would remove us from any immediate claim to the estate but she would preserve the estate for our ultimate use." Winifred testified that she was told by her mother in 1958 that it was necessary to sign quitclaim deeds to the Hennepin County property so that the operation of the farm could continue undisturbed, and this would result in a mere deferral of the children's distribution of their shares of Mr. Clark's estate. Winifred claimed that she signed a quitclaim deed to the Hennepin County farm in June, 1959. Ross did not testify at trial. Mrs. Clark, John, and Wallace Odell denied that any agreement, other than the written family settlement contract, had been entered into by Mrs. Clark and her children. Odell stated that he had not drafted any quitclaim deeds for transfer of the Hennepin County real property during the 1958–59 period.

After Mr. Clark's death, Mrs. Clark, John, and John's family moved to the Scott County farm. The Hennepin County property was primarily wasteland, and after 1961 was not farmed. In 1960 Mrs. Clark and John entered into an agreement severing their farming partnership, which was no longer needed after Mr. Clark's estate was closed. In addition, the agreement provided, *inter alia*, that John convey to Mrs. Clark all of his interest in the Hennepin

---

**3.** John testified that he and his mother were surprised that this property was owned solely by Mr. Clark, because they understood that the

Hennepin County farm was held in joint tenancy by Mr. and Mrs. Clark.

County farm; the joint tenancy in the Scott County farm was severed and Mrs. Clark agreed to convey to John a portion of her interest in the Scott County property; Mrs. Clark leased to John her interest in the balance of the Scott County farm with an option to purchase the property at fair market value; and John agreed to assume and pay the mortgage indebtedness on both the Hennepin and Scott County properties. The contract also provided that John agreed to be bound by any will his mother might make which omitted him as an heir. Pursuant to the agreement, John conveyed to Mrs. Clark, by quitclaim deed, his interest in the Hennepin County farm.

The Scott County property was sold on a contract for deed in August 1969. On October 22, 1969, John and Mrs. Clark entered into an accord and satisfaction agreement which stated that all debts and claims arising out of their 1960 agreement were discharged and satisfied and that the accord and satisfaction agreement replaced the 1960 agreement. The accord and satisfaction apportioned payments to be received from the contract vendee and apportioned the responsibility for paying debts with respect to the Scott County property. The agreement also reaffirmed John's renunciation of any interest in Mrs. Clark's estate, and John agreed to be bound by the terms of any will which his mother might execute omitting him as an heir.

On September 1, 1970, the Hennepin County farm was sold on a contract for deed to Waste Management for $250,000, payments to be made on September 1 of each year until 1980, when the balance would be due in a balloon payment. At that time, Wallace Odell examined the title to the Hennepin County farm and determined that the property was owned by Mrs. Clark and her children, except John. Accordingly, Odell used certain quitclaim deeds, which had been executed by the children in 1964 and 1965 when Bruce considered buying the Hennepin County farm

and had been retained in Odell's files, to transfer title to Mrs. Clark to facilitate the sale.[4] Since these deeds contained an incorrect legal description, it was later necessary to prepare new deeds.

The first payment made on the contract was about $60,000. Out of this payment, Mrs. Clark loaned Bruce about $42,000. Shortly thereafter, on December 30, 1970, Mrs. Clark and Bruce entered into a contract for last will and testament. The document was prepared by Bruce with the advice of his attorney, after discussions with Mrs. Clark. The agreement provided that Mrs. Clark would leave her estate to her children, except for John, in equal shares, but she was still free to make a present of an undetermined amount to her niece, Edith Imm. The contract stated that the consideration for Mrs. Clark's promise was the fact that Bruce had borrowed against his anticipated inheritance and had secured these loans with promissory notes "based on receiving one fifth of all gifts to and estate left to" the five children named in the agreement. Mrs. Clark gave some of Bruce's promissory notes to her other children.

In late 1970, or early 1971, Philip, who had become concerned about transfers to Bruce and John, sought to have Mrs. Clark's property put in an inter vivos trust. Since Wallace Odell was representing John, it was decided that Mrs. Clark should have independent representation regarding the setting up of a trust. Philip was then referred to Raymond Reister, a Minneapolis attorney. In January 1971 Mrs. Clark and Philip went to Reister's office to discuss the concept of a trust. Reister testified that Mrs. Clark gave him the "impression" at the meeting that:

"* * * there was a fundamental agreement that Mrs. Clark's quote estate, close quote, was to be divided evenly among the five children excluding John, since he had already received substantial

4. Bruce testified that Wallace Odell told him in 1964 that the original quitclaim deeds, allegedly executed in 1958–59, were misplaced or lost.

assets and that Philip's[5] share of the estate would be first paid off, or satisfied at the time of Mrs. Clark's death by the return to him of certain notes which he had issued to Mrs. Clark in return for the monies that came from the sale of the— or the initial sale of the Eden Prairie farm, which notes in turn Mrs. Clark had then given to her other children."

He also stated that Mrs. Clark had "expressed" to him "that there had been a family settlement, that John had received his share and that he was not to share in her estate at the time of her death."

Subsequent to this meeting, Mrs. Clark wrote a letter to Reister setting out the history of the Clark family. In that letter Mrs. Clark stated:

"A portion of my Scott Co. share was put in John & wifes [sic] name. John relinquished any claim in my estate—At my death my estate was to be equally divided between the 4 brothers & 1 sister with a separate provision for Edith."

In the same letter she also wrote:

"It was understood among the family that when the property was sold, I would make provision for transfer of payments to them without waiting until my death. I wrote letters to each of them within a year past that I had no intention of using money from the Eden Prairie sale for myself."

On January 20, 1972, Mrs. Clark executed a revocable inter vivos trust and pour-over will prepared by Reister. As a result, all of Mrs. Clark's property was placed in trust with Mrs. Clark and Reister named the trustees. According to the documents, Mrs. Clark's residuary[6] estate at her death was to be divided, in equal shares, among her children other than John. In letters dated March 1, 1972, Reister explained to the Clark family members the various provisions of the documents, and advised them that the trust was revocable. None of the children reacted to Reister's letter.

Subsequently, Reister determined that the trust agreement was a technical violation of the 1958 family settlement agreement which stated that Mrs. Clark was to draft a will in a certain manner and not revoke or modify it in any way. Accordingly, he so informed the family in a letter dated August 24, 1972, and requested that they sign forms consenting to the substitution of the trust instrument and pour-over will for the will described in the 1958 settlement agreement. Mrs. Clark and John responded by consenting to the trust and will.

The payments on the contract for deed on the Hennepin County property were paid to Mrs. Clark and, until 1976, a substantial portion of these monies was distributed by her as gifts to her children, except for John. As of that time, Mrs. Clark had received about $192,000 in payments on the Hennepin County property contract for deed and had distributed about $138,000 of that amount to her children, other than John. Much of the balance of the proceeds from the Hennepin County farm was used by Mrs. Clark to pay certain expenses, such as taxes and a real estate commission.

In September 1976 Mrs. Clark transferred $30,000 to John, approximately $20,000 of which was from a payment on the Hennepin County farm. At that time John had suffered serious financial problems and Mrs. Clark wanted to assist him with this money because she was thankful for the help John had given her and Mr. Clark in the past. Thereafter Mrs. Clark and John discussed using her interest in the Hennepin County property contract for deed as security to assist John in borrowing additional money.

On November 11, 1976, Mrs. Clark wrote a letter to Reister revoking the trust. In the letter she noted that there was a misunderstanding in the terms of the trust agreement. This litigation was then commenced to prevent the revocation of the trust set up

---

5. Apparently Reister misspoke and he meant to refer to Bruce.

6. The residuary estate included all her property, except a $20,000 bequest to Edith Imm and a specific bequest of all her personal belongings to Tom, or John if Tom predeceased her.

in 1972.[7] The case was tried to the court, sitting without a jury. After a five-day trial, the court found:

"That subsequent to the written family settlement agreement, Winifred Neie, Thomas P. Clark and the plaintiffs orally agreed to deed all of their right, title, and interest in and to all of the Hennepin County real property to Pansy P. Clark. In consideration of the said children's agreement to so transfer the real property defendant Pansy P. Clark orally agreed that she would make a Last Will and Testament providing for the equal disposition of her estate, real and personal, to each of the surviving children of said Thomas R. Clark with the exception of John R. Clark. Further, defendant Pansy P. Clark agreed with Winifred Neie, Thomas P. Clark and all the plaintiffs that during her lifetime she would preserve the real property in Hennepin County, Minnesota, and her personal property [from Mr. Clark's estate [8]] for the benefit of Winifred Neie, Thomas P. Clark and all the plaintiffs. Pansy P. Clark also agreed that she would only utilize so much of the proceeds of any sale of that property, real and personal, as was needed for her ordinary living expenses and would transfer, during her life, any sums of money in excess of those needs to Winifred Neie, Thomas P. Clark and all the plaintiffs in equal shares."

The court also concluded that Mrs. Clark's actions in revoking the 1972 trust breached the terms of this oral agreement. Accordingly, it imposed a constructive trust on most of Mrs. Clark's property.[9] The judgment also provided, in pertinent part:

"10. That the terms of such constructive trust are that Pansy P. Clark may have the right to utilize the assets of that trust during her lifetime for her needs but that any gifts made from those assets shall be made only to Winifred Neie and the plaintiffs in equal shares and that at her death the balance of the assets in that trust, taking into consideration previous advances, shall be left to Winifred Neie and the plaintiffs in equal shares with the exception of a specific gift of $20,000 to Edith Imm.

"11. That the trust assets shall not be utilized, in any manner, by the trustee or by Pansy P. Clark to make any payments relating to the Scott County real property.

"12. That any other property of Pansy P. Clark not subject to the terms of the constructive trust can be utilized by her in any manner she so desires during her lifetime.

"13. That any other property owned by Pansy P. Clark at her death shall become part of the Estate of Pansy P. Clark to be distributed, after taking into consideration previous advances, equally to Winifred Neie and the plaintiffs, again subject to the specific gift of $20,000 to Edith Imm.

"14. That a trust agreement and a pour-over will shall be prepared in accordance with the provisions of this Order and that Pansy P. Clark shall be affirmatively required to execute said trust and will and that she shall be permanently enjoined and restrained from modifying either instrument except with the express written consent of Winifred Neie and all plaintiffs.

&ast; &ast; &ast; &ast; &ast; &ast;

"16. That defendant John R. Clark shall give his negotiable promissory note for $23,092.50 payable to the trust estab-

7. In their complaint, plaintiffs also sought to have the $30,000 transfer to John from Mrs. Clark in September 1976 set aside on the ground of undue influence. The district court found that John did not exert undue influence against Mrs. Clark. Plaintiffs do not contest this ruling on appeal.

8. It is clear from the district court's legal conclusions that the personal property referred to in this factual finding is the personal property from the estate of Mr. Clark.

9. The constructive trust included property valued at about $177,000. The only asset of Mrs. Clark which was not included in the trust was a $66,000 note payable by John to Mrs. Clark plus about $12,000 interest accrued on the note. Also, the trust was not imposed on Mrs. Clark's monthly Social Security check.

lished herein with interest payable at the rate of 6% per annum commencing as of January 26, 1977, and payable on each January 26 hereafter until the death of Pansy P. Clark, at which time the principal amount of said note shall become due and payable to the trust."

Thereafter, defendants made various post-trial motions which were denied by the district court on June 8, 1977. This appeal followed, presenting the following issues:

(1) Does the evidence support the trial court's factual findings that Mrs. Clark orally contracted to make a will and use certain property only for her "ordinary living expenses," preserving the remainder for her children, other than John?

(2) As a matter of law, is equitable relief proper in this case?

(3) Assuming that equitable relief is proper as a matter of law, is the specific remedy imposed and the terms thereof appropriate?

■■■ 1. The trial court's pertinent factual findings [10] can be summarized as follows: (1) that Mrs. Clark orally agreed to will all her property to her children,[11] other than John, if they conveyed to her their interest in the Hennepin County property; (2) that Mrs. Clark agreed to use the proceeds from the Hennepin County farm and her share of the personal property from her husband's estate only "as was needed for her ordinary living expenses" and would preserve the balance for her children other than John; and (3) that by imposing a constructive trust on Mrs. Clark's property (other than John's note of $66,000, which represented Mrs. Clark's advancement to John of her interest in the Scott County farm) the trial court impliedly found that this property was derived from the Henne-

pin County farm proceeds or her share of the personal property from Mr. Clark's estate. We believe that findings (1) and (2) are supported by the record. However, finding (3) is only partially supported by the evidence.

■■■ As for the first finding, Raymond Reister, a disinterested witness, testified that Mrs. Clark "expressed" to him "the fact that there had been a family settlement, that John had received his share and that he was not to share in her estate at the time of her death." Similarly, Reister stated that it was his impression "after talking to Mrs. Clark that Mrs. Clark's estate was to be divided evenly among the five children excluding John * * *." Mrs. Clark, herself, in a letter to Reister acknowledged the existence of the oral agreement. For example, she wrote:

"A portion of my Scott Co. share was put in John & wifes (sic) name. John relinquished any claim in my estate—At my death my estate was to be equally divided between the 4 brothers & 1 sister with a separate provision for Edith."

The testimony of Bruce, Philip, and Winifred, as set out above, provides further support for the court's finding that a contract to will Mrs. Clark's property to her children had been entered into. And, finally, it was reasonable to conclude, as the trial court did, that the 1970 contract to make a will entered into between Mrs. Clark and Bruce was a further acknowledgement of the oral agreement Mrs. Clark made with her children. Accordingly, the trial court's finding that Mrs. Clark had contracted to will her property to her children, except John, is adequately supported

10. To be sustained, a contract to make a will must be proved by "clear, positive, and convincing evidence," e. g., *Alsdorf v. Svoboda*, 239 Minn. 1, 57 N.W.2d 824 (1953), as opposed to the traditional standard of a preponderance of the evidence. Defendants contend that "it appears that the trial court employed the wrong burden of proof, applying the mere preponderance standard rather than the higher clear, positive and convincing standard." The

record, however, does not indicate which standard was applied by the district court. We believe that it is fair to presume, though, that the trial court applied the correct standard in reaching its decision. See, *Loth v. Loth*, 227 Minn. 387, 35 N.W.2d 542 (1949). Accordingly, we reject defendants' contention.

11. With the exception of a $20,000 gift to Mrs. Clark's niece, Edith Imm.

by the evidence and thus must be sustained.[12]

■ The restrictions on the use and distribution of a portion of Mrs. Clark's property, as found by the trial court, also are adequately supported by the evidence. For example, in her letter to Reister, Mrs. Clark stated:

"It was understood among the family that when the property was sold, I would make provision for transfer of payments to them without waiting until my death. I wrote letters to each of them within a year past that *I had no intention of using money from the Eden Prairie sale for myself.*" (Italics supplied.)

Similarly, Bruce testified as follows:

"Q. Did you in fact execute a quit-claim deed to the property in Eden Prairie?

"A. Yes, I did.

"Q. Now, did anyone—did you have any conversations with your mother concerning what would happen to that property after you quit-claimed it to her?

"A. Yes.

"Q. What was that conversation and when did it take place?

"A. It took place in 1958 and the gist of the conversation was that in return for giving up our direct inheritance rights she would preserve and keep that property for our use.

"Q. And in that agreement [the 1958 family settlement agreement] that we looked at a while ago, Exhibit 5 I believe it was, do you recall the provision in that agreement that provided that your mother was go-

ing to execute a Last Will and Testament?

"A. Yes.

"Q. Was that discussed with you by her at that time?

"A. It was.

"Q. And what was the nature of that discussion?

"A. She said that she recognized that this belonged to the children as well as to her and that she would only keep for herself what she needed to live on and that she would divide all of her property between her children with the exception of John who was her partner, and that she reserved the right to leave an inheritance of five thousand dollars for Edith Imm, my cousin."

The trial court's finding regarding limitations on Mrs. Clark's use and transfer of certain property also finds support in the testimony of Philip. As he stated at trial:

"Q. Okay. Did you have some discussions with your mother, though, concerning your interest in the Eden Prairie property?

"A. Yes.

"Q. What were those discussions?

"A. The discussions were that, to make things quick and simple, keep the operation going, the best thing for us to do was to sign quit-claim deeds which would remove us from any immediate claim to the estate [of Mr. Clark] but that she would preserve the estate for our ultimate use."

The above evidence is sufficient to support finding (2).[13]

---

12. It should be noted that the defendants argue that any oral agreement is invalid because the provisions of the 1958 family settlement agreement cannot be varied by parol evidence. However, defendants made no objection to the introduction of evidence regarding this oral agreement. But more importantly, the parol evidence rule does not preclude proof of oral agreements made subsequent to a written contract. *Steller v. Thomas*, 232 Minn. 275, 45 N.W.2d 537 (1951). Here, the trial court found, and the evidence supports, the fact that the oral contract was made subsequent to the written family agreement. Thus, the parol evidence rule does not preclude plaintiffs from proving the oral agreement.

13. Contrary to defendants' contention, the fact that the 1972 trust was revocable and did not expressly restrict Mrs. Clark's ability to use her property does not require that the trial court's finding be overturned. The district court found and the record supports the proposition that Wallace Odell advised Mrs. Clark that an irrev-

However, as indicated above, we believe that the record does not fully support the trial court's implied finding that all of Mrs. Clark's property, except the $66,000 note of John, is attributable to the Hennepin County farm proceeds or Mrs. Clark's share of her husband's personal property. For example, the trust as imposed by the trial court included Mrs. Clark's mobile home valued at $8,000. Mrs. Clark's letter to Reister, though, indicates that the mobile home was purchased with funds from the Scott County property. The record does not state from what source Mrs. Clark's $12,000 bank account or her household goods and checking account (both valued by the trial court as "nominal") were derived. Of course, the bulk of Mrs. Clark's property, $115,000 left on the Hennepin County property contract for deed, plus accrued interest since September 1, 1976, is quite obviously attributable to the Hennepin County farm. Likewise, it is reasonably inferable from the evidence that Mrs. Clark's interest in advances (valued at $39,000) given to Bruce and Ross originated in the proceeds from the Hennepin County farm.

We, therefore, conclude that the record shows that only the payments remaining on the Hennepin County property contract for deed and Mrs. Clark's interest in advances are attributable to property that Mrs. Clark agreed to preserve for her children, other than John. Consequently, as a factual matter, the other property presently in Mrs. Clark's control is not subject to any restrictions on lifetime use or distribution.[14]

2. Defendants contend that, because the consideration underlying Mrs. Clark's oral promise to make a will is not of a "certain highly specialized type," the trial court erred in imposing an equitable remedy. They refer to a long line of cases [15] wherein this court has held that—

"* * * specific performance of an oral contract to devise land will be granted where the promisee, pursuant to such contract, has assumed a peculiarly personal and domestic relation as a member of the family of the promisor and has given to him the society and services incident to such relation and of a kind and character, the value of which is not measurable in money." *Goette v. Howe,* 232 Minn. 168, 172, 44 N.W.2d 734, 737 (1950).

Contrary to defendants' theory, these cases do not limit a trial court's authority in granting equitable relief to those precise factual settings. Rather, these decisions acknowledge that the peculiar and personal nature of this type of consideration is not compensable in money damages and, consequently, there being no adequate remedy at law, an equitable remedy would lie. See, e. g., *Downing v. Maag,* 215 Minn. 506, 511, 10 N.W.2d 778, 781 (1943); *Herman v. Kelehan,* 212 Minn. 349, 353, 3 N.W.2d 587, 589 (1942).

Although such consideration is not involved here, there nevertheless is authority for concluding that plaintiffs are without an adequate legal remedy and thus are entitled to equitable relief. In two prior cases, *Jannetta v. Jannetta,* 205 Minn. 266, 285 N.W. 619 (1939), and *Anderson v. Anderson,* 197 Minn. 252, 266 N.W. 841 (1936), this court recognized that contracts in the nature of a family settlement agreement are supported by more than simple pecuniary consideration. Such agreements are designed to settle claims among family members, forestall family disputes, prevent litigation, and generally preserve family property. Like unique personal services, this consideration cannot be measured in money. Accordingly, in both *Anderson* and *Jannetta,* the court concluded that plaintiffs' legal

---

ocable trust would have had immediate gift tax consequences. Thus, it is reasonable to infer from the evidence that the written trust agreement was made revocable and without certain restrictions in order to avoid immediate tax consequences.

14. We note that our ruling does disturb the trial court's uncontradicted factual finding that

a portion of certain money Mrs. Clark advanced to John in September 1976 was attributable to Hennepin County property.

15. E. g., *Husbyn v. Lunde,* 283 Minn. 74, 166 N.W.2d 333 (1969); *Goette v. Howe,* 232 Minn. 168, 44 N.W.2d 734 (1950).

remedy for breach of such an agreement was inadequate and equitable relief was thus proper.

■■■■ The reasoning of *Jannetta* and *Anderson* supports the trial court's decision in this case. Mrs. Clark's oral promise to make a will is comparable to a family settlement agreement; it had the effect of preventing disputes and preserving the family peace and property. Indeed, it can even be characterized as supplementing the formal written family settlement agreement entered into by the Clarks. Consequently, the consideration given for Mrs. Clark's promise to make a will cannot be measured in money, plaintiffs' legal remedy is thus inadequate, and equitable relief is proper.[16]

■■■■ Defendants also contend that the trial court erred by ordering specific performance of a contract to make a will prior to the death of the promisor. We agree with defendants' contention because the promisor has his entire life to make a will and therefore only on his death can it be determined whether the contract was breached. Annot., 7 A.L.R.2d 1166 (1948). Other forms of equitable relief, though, are certainly appropriate during the promisor's lifetime. See, *Matheson v. Gullickson,* 222 Minn. 369, 24 N.W.2d 704 (1946). See, generally, 1 Page, Law of Wills § 10.21; Sparks, Legal Effect of Contracts to Devise or Bequeath Prior to The Death of The Promisor: I, 53 Mich.L.Rev. 1 (1954). This conclusion merely recognizes that a court of equity is to be accorded broad latitude in fashioning remedies to meet the particular

needs of each case. See, e. g., *City of Cloquet v. Cloquet Sand and Gravel, Inc.,* 312 Minn. 277, 279, 251 N.W.2d 642, 644 (1977); *Beliveau v. Beliveau,* 217 Minn. 235, 14 N.W.2d 360 (1944). As was observed in *Beliveau v. Beliveau, supra:*

> " * * * A court of equity has the power to adapt its decree to the exigencies of each particular case so as to accomplish justice. It is traditional and characteristic of equity that it possesses the flexibility and expansiveness to invent new remedies or modify old ones to meet the requirements of every case and to satisfy the needs of a progressive social condition. [Citation omitted.]" 217 Minn. 245, 14 N.W.2d 366.

Based on the foregoing, we conclude that plaintiffs' claim for specific performance is premature and, instead, is properly brought after Mrs. Clark's death.[17] However, the trial court has the authority to impose other types of equitable remedies during Mrs. Clark's lifetime to protect plaintiffs' interests.

3. Finally, defendants refer to various factors in arguing that even if an equitable remedy is proper as a matter of law, the granting of equitable relief in this case is unreasonable and thus beyond the district court's discretionary power. We agree with defendants' claim only insofar as a provision of the court's order limited Mrs. Clark's personal use of her property to "her needs" during her lifetime.

■■■■ In imposing an equitable remedy in the context of a contract to make a

---

**16.** Likewise, we find no merit to defendants' contention that the statute of frauds is a bar to relief. This defense was not affirmatively pleaded in defendants' answers as required by Rule 8.03, Rules of Civil Procedure, nor was the issue raised at trial. Accordingly, defendants have waived their statute of frauds defense. *Rehberger v. Project Plumbing Co., Inc.,* 295 Minn. 577, 205 N.W.2d 126 (1973). Even if the question were properly before the court, we would be compelled to reject defendants' assertion. In *Anderson v. Anderson,* 197 Minn. 252, 266 N.W. 841 (1936), and *Jannetta v. Jannetta,* 205 Minn. 266, 285 N.W. 619 (1939), this court indicated that full performance on the part of the promisees will prevent the statute of frauds

from voiding an oral contract. See, also, *Hecht v. Anthony,* 204 Minn. 432, 435, 283 N.W. 753, 754 (1939); *Chantland v. Sherman,* 148 Iowa 352, 358, 125 N.W. 871, 873 (1910).

**17.** We note that even though Mrs. Clark cannot be ordered to make a will, it appears that the decision in this case will collaterally estop a party in a subsequent action from effectively arguing that an oral agreement to make a will had not been entered into. Therefore, as a practical matter, if Mrs. Clark does not make a will consistent with her oral contract, upon her death plaintiffs will prevail in an action brought to enforce the agreement.

will, an element to be considered is whether enforcement of the agreement will cause unreasonable or disproportionate hardship or loss to the defendant. See, e. g., *Husbyn v. Lunde*, 283 Minn. 74, 166 N.W.2d 333 (1969); *Alsdorf v. Svoboda*, 239 Minn. 1, 57 N.W.2d 824 (1953). In this case, we believe that a restriction upon the manner in which Mrs. Clark spends her money on herself results in an unreasonable hardship. Such a provision essentially requires Mrs. Clark, a woman in her 80's, to be subject to a trustee's judgment as to what expenses are "ordinary living expenses" or which can be classified as extravagant. Since Mrs. Clark has been extremely generous with her children in the past, it is unreasonable for her to be placed in such a position. Thus, equity will not restrict the way in which Mrs. Clark can spend her money on herself. Our conclusion, of course, does not disturb the term of the trial court's order which provides that, with the exception of a specific amount to Edith Imm, Mrs. Clark may make gifts of certain property only to plaintiffs and Winifred. Accordingly, Mrs. Clark can use her property, without restriction, for herself during her lifetime, but she will not be able to make gifts or other advances from particular property to John.[18]

In light of our modification of the terms of the district court's order, we believe that injunctive relief, as opposed to a trust, should be utilized in this case. An injunction will adequately protect against an improper distribution of certain of Mrs. Clark's property without incurring the expense and inconvenience associated with the administration of a trust.

In summary, we modify the decision of the trial court in the following manner:

(1) The promissory note to be executed by John pursuant to conclusion of law No. 16 shall be made payable to Mrs. Clark, instead of a trust.

(2) This promissory note, the payments remaining on the Hennepin County contract for deed, including accrued interest, and the $39,000 in advances made to Ross and Bruce may be used by Mrs. Clark for herself, without limitation, during her lifetime. However, Mrs. Clark will be enjoined from making gifts or other advances of the above referenced property to anyone other than plaintiffs and Winifred, with the exception of a specific gift of $20,000 to Edith Imm. (Any payment made out of the above referenced property relating to the Scott County farm shall be considered an improper gift or advancement.)

(3) Mrs. Clark may use and distribute any of her property not listed in paragraph (2) in any manner she so desires during her lifetime.

(4) Mrs. Clark is not required to execute a will or a trust document.

We remand to the district court for the entry of an order and judgment consistent with the decision reached herein.

Affirmed in part; modified in part; and remanded.

---

18. We note that such a result is consistent with the primary objectives sought by plaintiffs in bringing this action. Plaintiffs' counsel indicated at oral argument that Mrs. Clark's children are not concerned with how their mother uses her money for herself. Rather, they object to Mrs. Clark giving certain of her monies, which were derived from the Hennepin County property, to John.